[Cite as *State v. Piersoll*, 2012-Ohio-1857.]

IN THE COURT OF APPEALS FOR CLARK COUNTY, OHIO

STATE OF OHIO                    :

      Plaintiff-Appellee           :         C.A. CASE NO.    2011 CA 30

v.                            :         T.C. NO.    11CR70B

ANDRE M. PIERSOLL         :        (Criminal appeal from
                                         Common Pleas Court)

      Defendant-Appellant     :

                            :

. . . . . . . . . .

**O P I N I O N**

Rendered on the    27th    day of    April   , 2012.

. . . . . . . . . .

LISA M. FANNIN, Atty. Reg. No. 0082337, Assistant Prosecuting Attorney, 50 E. Columbia Street, 4th Floor, P. O. Box 1608, Springfield, Ohio 45501
      Attorney for Plaintiff-Appellee

MONTE K. SNYDER, Atty. Reg. No. 0005213, 6501 Germantown Road, Lot 41, Middletown, Ohio 45042
      Attorney for Defendant-Appellant

. . . . . . . . . .

DONOVAN, J.

    **{¶ 1}**    This matter is before the Court on the Notice of Appeal of Andre M.

Piersoll, filed April 20, 2011. On February 7, 2011, Piersoll was indicted on one count of robbery, in violation of R.C. 2911.02(A)(2), a felony of the second degree. Piersoll was found guilty by a jury on April 8, 2011, and the trial court sentenced him to five years in prison.

{¶ 2} At Piersoll's trial, Springfield Police Officer Joseph Lewis testified that on January 30, 2011, he was dispatched, while on routine patrol, to a large fight in the area of 115 North Western Avenue. Lewis testified that he was advised by dispatch that "there was a subject out there possibly armed with a firearm." Upon arrival at the scene, Lewis stated that he observed Piersoll walking eastbound down the street toward an alley. Lewis testified that bystanders advised him, "'He's the one with the gun.'" Lewis apprehended Piersoll at gunpoint. According to Lewis, Piersoll was carrying a 40-ounce container of beer. When other officers arrived, Lewis stated that Piersoll was handcuffed and placed in a cruiser. According to Lewis, after a search, the officers did not find a weapon on Piersoll's person. Lewis testified that he and the other officers also searched the area, and they did not recover a weapon.

{¶ 3} On cross-examination, Lewis stated that he observed more than 15 people at the scene when he arrived. Lewis testified that Piersoll complied with his orders when Lewis detained him. In the course of Lewis' investigation, he stated that he learned that $7.00 and a cell phone had been taken from the victim herein, Robert Mitchell. Lewis testified that no cash or cell phone were found on Piersoll. He further stated that Julio Freeman, who fled the scene before officers arrived, was also later apprehended.

{¶ 4} Springfield Police Officer James McCutcheon testified that he and his

partner were dispatched around 7:00 p.m. to the scene on the report of a large fight. Upon arrival, McCutcheon stated that he observed Lewis holding Piersoll at gunpoint, and he approached the men to assist Lewis. McCutcheon stated that Piersoll was initially patted down before being placed in the cruiser, and that his pockets were later searched after the officers learned that Mitchell's money and cell phone had been taken. The officers found nothing on Piersoll's person, according to McCutcheon. Next, as McCutcheon searched the area for a gun, dispatch advised him of Freeman's nearby whereabouts, and McCutcheon located Freeman and placed him under arrested. McCutcheon testified that he searched Freeman and did not find a gun. After learning that money had been taken from the victim, McCutcheon searched Freeman's pockets and did not find any money.

{¶ 5} On cross-examination, McCutcheon stated that he searched Piersoll himself and did not find money, a weapon or a cell phone on his person. McCutcheon testified that he learned that Freeman had an outstanding warrant for his arrest, and he acknowledged that "people sometimes run when they have outstanding warrants." McCutcheon further testified that he and the other officers searched the areas where Piersoll and Freeman were apprehended and did not find money, a weapon or a cell phone. Finally, McCutcheon stated that he learned that when Mitchell was later questioned, Mitchell had possession of his cell phone.

{¶ 6} Mitchell, who was 28 years old at the time of trial, testified that he walked from his home on the evening of the robbery to the home of his parents, who live at 221 North Western Avenue. When he arrived, Mitchell stated that his parents asked him to walk to the nearby Family Dollar store to buy "muscle rub and headache pills." According

to Mitchell, on his way to the store, he observed Freeman, and he testified that he said to him, "'What's up, Julio?'" According to Mitchell, Freeman responded, "'What's up, John?'" Mitchell testified that he then said, "'I'm not John, I'm Rob.'" Mitchell stated that Freeman was with Piersoll, and he testified as follows:

> And he started talking to Piersoll. He was like well, yeah, when we was younger, me and him got in trouble and he snitched. And then it was - - they both said dude we're gonna rob you; give me everything you got.

> And so I got my phone, and Piersoll he told Julio, go in his pockets and make sure he ain't got nothing else. And they got my phone and $7; and that's when James Fisher called out and yelled, "What's going on?" And I said, "They're robbing me." And then he said, "Come on up here'" And I went to go run away, and then Piersoll hit me on the side of the head right here; and I got up on James' porch and he told me go in the house. And then James comes back in and hands my cell phone to me and said, "I got your cell phone back," but I couldn't find or get your $7 back.

**{¶ 7}** Mitchell testified that he and Freeman grew up in the same neighborhood and were acquainted, but he stated that he did not know Piersoll. When he encountered the men, Mitchell stated that they had just left the home of Melissa Rice and were on the sidewalk in front of her home. When asked if the men threatened him, Mitchell responded, "Piersoll threatened me. He said, 'If you don't give me what you got, I got a gun.' And he opened his coat and showed me the handgun and put his coat back." Mitchell stated that Piersoll wore a "big green or puffy black coat," and a hoodie. Mitchell testified that

Freeman searched his pockets to "make sure I didn't have nothing else on me." Mitchell stated that once Piersoll hit him with his fist, he became upset and "started crying and * * * blacked out."

{¶ 8} The following exchange occurred:

Q. Okay. So who actually got the phone and money out of your pockets?

A. I - - well, when they told me to do it, I'm the one that had my phone in my coat pocket, and I took it out. * * * And that's when they grabbed it, and they grabbed my money; and then Julio started going in my pockets.

Q. Okay. So Julio went in your pockets. Who grabbed? You said they grabbed it. Who specifically grabbed it?

A. * * * Piersoll had my phone, and I don't know which one had the $7 'cause the cops couldn't find it.

Q. Okay. But you don't remember who took your money?

A. No.

{¶ 9} Mitchell testified that after the robbery he went into Rice's house for five or ten minutes, and when he came back outside, Freeman and Piersoll were still out front, and "they had a little fight out there." Mitchell did not know what the fight was about, according to his testimony, and he remained on the porch until the officers arrived. He stated that he heard Freeman "say something about shooting something * * * and he was gonna shoot Missy's dog." Mitchell stated that he did not see a gun at that time.

{¶ 10} When the officers arrived, according to Mitchell, Freeman "took off running down the alley," and Piersoll "tried to take off running." Mitchell testified that he told the officers that he knew Freeman, but he could not identify Piersoll "'cause I didn't get to see his face. * * * and that's when Missy and them said they knew him." When the officers returned with Piersoll in custody, Mitchell testified that he recognized his clothing as the same as that worn by his attacker. According to Mitchell, he "knew his coat and the hoodie." Mitchell testified that on the following day, he sought medical attention, and he was diagnosed with "a concussion on the side of my head." Mitchell stated that he was given medicine for pain.

{¶ 11} On cross-examination, Mitchell testified that it was dark outside when the robbery occurred. He stated that there were several people outside, including James Fisher, Rice, Nicole Longberry, Shawn Fisher, and Lakeem Quisenberry. Mitchell stated that Piersoll hit him when he turned to go to Rice's house. Mitchell testified that he did not remember that the officers offered him medical treatment but he refused it, and he did not remember telling them that he was never threatened with a gun. Mitchell stated that he had 11 years of schooling and is a "slow learner." When asked if his learning disability makes it difficult to recall things, Mitchell responded, "Probably so, sir." When asked if he has ever received mental health treatment, Mitchell stated, "I been there for suicidal." Mitchell testified that he takes Risperdal 3 every morning to improve his focus. Mitchell stated that he took his medication on the day of the robbery. According to Mitchell, his parents gave him a five dollar bill and two ones to take to the Family Dollar store. Mitchell testified that after the robbery, and before the fight, Piersoll and Freeman initially followed

him into Rice's house, and Piersoll spoke to Mitchell and denied committing the offense. Mitchell testified that after the robbery, he and other people in the neighborhood came outside in response to the sound of the fight.

{¶ 12}   James Fisher testified that he is 41 years old, and at the time of the robbery, he was visiting his son, Shawn Fisher, who lives with Melissa Rice.  Fisher stated that Nicole Longberry is his stepdaughter.  According to Fisher, "[w]e was all over there.  We was outside smoking and [Piersoll] and [Freeman] came over to visit, to talk to Nicole."  Fisher stated that Freeman used to date Longberry.  According to Fisher, Freeman and Piersoll were drinking beer.  Fisher testified that Freeman and Piersoll left after 20 minutes to a half hour.  Sometime thereafter he heard Mitchell call out to him, using his nickname, "Bootsy."

{¶ 13}   After learning that Mitchell had been robbed, Fisher stated that he told Mitchell to come in the house.  Fisher then approached Freeman, who was outside.  Fisher testified that he said to Freeman, "'Man, why don't you give his phone back, he don't want no trouble.'" According to Fisher, Freeman gave him the phone as Piersoll stood by.   When he asked them both for Mitchell's money, Fisher testified that they "said they never took no money out of his pocket."   Fisher stated that he did not observe a weapon.  Fisher further stated that Freeman and Piersoll came back inside Rice's home and denied taking anything from Mitchell.  Fisher asked them to leave, and when they went back outside, "the police was coming down the street and they ran."  Fisher stated that an officer caught Piersoll across the street in an alley, and he did not see where Freeman ran. Fisher   admitted that he has prior felony convictions for receiving stolen property, felonious assault and carrying a

concealed weapon.

{¶ 14}  Nicole Longberry testified that she is twenty years old, and that she is the daughter of Melissa Rice.   According to Longberry, she was visiting her mom at 115 North Western Avenue, and James Fisher, John Malone, Lakeem Quisenberry and Stephanie Rice, Longberry's sister, were also present.   Longberry testified that Freeman and Piersoll also arrived at the residence.   She stated that Freeman and Piersoll "each had a 40 of Bud Light," and they were "kind of staggering."   Longberry stated that she and her mother told them to leave, because "every time they did come over, it was always, you know, a big commotion, everybody arguing.   So we kept telling them to leave, and they wouldn't leave."   After being told to leave more than five times, Freeman and Piersoll went down to the sidewalk as Mitchell was walking past.   According to Longberry, "Julio said, 'What's up, John?' [Mitchell] said, 'My name's not John.   My name's Robby.'   And Andre told Julio to get in Robby's pockets."      Longberry stated that Mitchell was scared, "and then everybody started getting into an argument.   They was arguing.   Robby was crying.   Julio started getting in his pockets, and Andre punched Robby in the side of his face."

{¶ 15}  The following exchange occurred:

Q.  Did you see a weapon?

A.  Yes.

Q.  Who had the gun?

A.  It was a gun.   It was black.

Q.  Did you see the whole thing?

A.  I seen the whole thing after the robbery occurred because that's

when the fight broke out, and that's when he handed - - Andre handed the gun at Julio; and he pointed at my dog, and everybody just . . .

Q. What kind of gun was it? Do you know the difference between a revolver - -

A. That's what it was. I was going to say it was a revolver. It had the little spinny thing in the middle. It was black.

Q. And who handed that to who?

A. Andre handed it to Julio.

Q. Who got in his pockets?

A. Julio did.

Longberry stated that after the robbery, Piersoll surrendered Mitchell's phone when Fisher confronted him. According to Longberry, her neighbors called the police when they heard the fighting outside. Longberry stated, when the officers arrived, "Julio took off down the alley. Andre wasn't running * * * and they stopped him right in the alley."

{¶ 16} On cross-examination, Longberry stated that she is very close to James Fisher and that she calls him her "stepdad." She stated that there were six or seven people outside Rice's home on the night of the robbery. Longberry stated that Venea Wilson is a friend of hers, and she denied telling Wilson that she did not observe the robbery and only came outside when the fight broke out. On re-direct, Longberry testified that her trial testimony was consistent with the version of events she related to the police.

{¶ 17} Melissa Rice testified that she lives at 115 North Western Avenue with her mother and two daughters. On the evening of the robbery, Rice testified that she was on her

porch smoking with Longberry, Quisenberry, and James and Shawn Fisher. According to Rice, Freeman and Piersoll arrived, and she and James Fisher asked them to leave because they were "really loud." She stated that Freeman and Piersoll were drinking beer. When Mitchell walked past, Rice stated that Freeman called him John, and that Mitchell corrected him regarding his name. Rice testified that Freeman and Piersoll "went down there, told him to empty his pockets, Julio Freeman was going through his pockets, took his phone, his money; and then Andre hit him in the side of his head." Rice stated that she told Freeman and Piersoll to leave Mitchell alone. Rice testified that she saw Piersoll with a weapon and that he "threw it to Julio." Rice denied that Freeman and Piersoll returned to her home after the robbery. Rice stated that the fighting stopped when the police arrived, and that Piersoll was caught in an alley. On cross-examination, Rice stated that a fight started between Quisenberry and Freeman, and that they were initially just joking around, but "it developed into something more than that." On re-direct, Rice stated that her trial testimony was consistent with the version of events she related to the police on the night of the robbery.

{¶ 18} After the State rested, Venea Wilson testified for Piersoll. According to Wilson, she and Piersoll had been in a relationship for a little over a year. Wilson testified that Longberry "is supposed to be my friend," but that they no longer speak to each other. According to Wilson, after the incident, she and Longberry had a conversation over the phone and another one "at the hospital," and that in both conversations, Longberry told Wilson "that the only thing she saw was when Andre and my brother was fighting outside of her house. That's the only thing she said she saw. She said she never seen them robbing anybody." On cross-examination, Wilson stated that she did not report her conversations

with Longberry to the police.

{¶ 19} Lieutenant Vern Whitt of the Clark County Sheriff's Department testified that he works in the Jail Division, and he described the procedure employed when a prisoner is brought to jail. According to Whitt, at defense counsel's request, he retrieved the clothing that was taken from Piersoll when he was transported to jail, and he brought it to trial. He identified Exhibit A as Piersoll's jacket, and he stated that the jacket was brown in color.

{¶ 20} Freeman testified that Wilson is his sister and that Piersoll is the father of Wilson's child. On the date of the incident, Freeman testified that when he observed Mitchell walking down the sidewalk, he "realized who it was. I'm like I remember him. He snitched on me a long time ago, and Andre confronted him about it. But, you know, but nothing happened between Andre and Robert Mitchell and me." Freeman stated that Piersoll confronted Mitchell, and that Mitchell and Piersoll exchanged words, but that neither he nor Piersoll robbed Mitchell. Freeman also denied that Mitchell was threatened or struck in the head. After the conversation ended, according to Freeman, he sat on the porch at Rice's house, "drinking, talking, having fun." He stated, after "that, me and Lakeem (phonetic) got into it. I can't remember what for, but me and him started fighting; and Shawn Fisher tried to jump in. So Andre got him out the way so I wouldn't get jumped, and the police got called. So after the police got called, I fled the scene because I had a pending charge." Freeman stated that he ran because he "didn't want to get caught and go back to jail 'cause I was out on bond." Freeman stated that he did not have a gun, and that he did not observe Piersoll with a gun in his possession. He further denied that Piersoll

handed him a gun. Freeman stated that when he was apprehended and searched, the police did not find $7.00 or a weapon on his person. Finally, he stated that he was charged with robbery as a result of the instant events, but that the charge was later dismissed.

{¶ 21} On cross-examination, Freeman testified that he had three or four beers and half a bottle of Wild Irish Rose with Piersoll. He stated that he called Mitchell "John" initially because he thought he was someone else. When he realized who he was, he called Mitchell a snitch to "[j]ust let 'em know that he's a snitch." He denied that he fled the scene to get rid of the gun and money. On redirect, Freeman clarified that he was on bond on a prior robbery charge when the instant offense was committed, that he was again charged with robbery as a result of the instant offense, but that the second robbery charge was dismissed as part of a plea bargain on the initial robbery charge.

{¶ 22} Finally, Piersoll called Joseph Lewis as a witness. Lewis testified that Mitchell was offered and refused medical treatment at the scene. On cross-examination, Lewis testified that Mitchell was offered medical treatment because he reported that he had been assaulted, and Lewis stated that he had a red mark on the right side of his head.

{¶ 23} On rebuttal, the State called Mitchell and he demonstrated the manner in which he was shown the handle of the gun inside the pocket of the jacket. Mitchell stated, "I thought they would shoot me if I didn't give 'em what I had." On cross-examination, when asked about the location of the gun, Mitchell stated, "[t]here should be a pocket on the inside and they had it 'cause that's where they showed it. It was a black handle." On redirect examination, when shown the brown jacket that was retrieved from Piersoll, and asked the color of the coat, Mitchell stated, "It was dark out. I thought it was green or

black. It was a dark-colored coat. I didn't know what color it was." When asked if he recognized anything about the coat, he responded, "[t]he puffiness on it." Mitchell stated that he did not notice that the coat had fur around the hood. On recross examination, Mitchell again confirmed that he observed the weapon in an inside pocket of the jacket worn by Piersoll.

{¶ 24} In closing argument, counsel for Piersoll emphasized that Piersoll's coat does not have an inside pocket.

{¶ 25} Piersoll asserts one assignment of error as follows:

THE COURT/JURY FOUND THE APPELLANT GUILTY ON A RECORD SO REPLETE WITH INCONSISTENCIES AND CONTRADICTORY TESTIMONY/EVIDENCE THAT THE JURY CLEARLY LOST ITS WAY AND CREATED SUCH A MANIFEST MISCARRIAGE OF JUSTICE THAT THE CONVICTION MUST BE REVERSED AND A NEW TRIAL ORDERED.

{¶ 26} According to Piersoll, "[r]arely is a trial so riddled with as many inconsistencies in testimony from eye witnesses, coupled with a total lack of physical evidence of a crime, that is a theft." He asserts that the investigating officers, who did not find a weapon or Mitchell's money, are the only disinterested witnesses, since the remaining witnesses, are "either family or arguably interested parties."

{¶ 27} Regarding Mitchell, Piersoll emphasizes that he could not identify him; that he did not remember which of his assailants took his money; that he was mistaken about the color of Piersoll's coat; that the coat did not have an inside pocket as Mitchell asserted; that

he did not remember refusing medical treatment or stating to police at the scene that he had not been threatened with a gun; that he admitted that he "blacked out" at the scene. Piersoll further asserts Mitchell's ability to recall events is affected by his learning disability.

{¶ 28} Piersoll further emphasizes that James Fisher did not witness the robbery, observe a gun, or see Piersoll strike Mitchell. Regarding Longberry, Piersoll argues that her testimony is focused on the events that occurred after the robbery, and that her testimony is inconsistent with Fisher's in that she stated that James Fisher retrieved Mitchell's phone from Piersoll, while James stated he retrieved the phone from Freeman. Piersoll further asserts that Longberry's testimony is contradicted by Wilson's testimony that Longberry told her that she did not observe the robbery.

{¶ 29} Regarding Melissa Rice, Piersoll asserts that her testimony, suggesting that Piersoll and Freeman did not return to her home after the robbery, is contradicted by Mitchell's testimony. Finally, Piersoll notes that Freeman denied that the robbery occurred and stated he fled the scene because he was out on bail, and being "engaged in a fist fight would be a violation of bail."

{¶ 30} As this Court has previously noted:

When an appellate court analyzes a conviction under the manifest weight of the evidence standard it must review the entire record, weigh all of the evidence and all the reasonable inferences, consider the credibility of the witnesses and determine whether in resolving conflicts in the evidence, the fact finder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

(Internal citations omitted).   Only in exceptional cases, where the evidence "weighs heavily against the conviction," should an appellate court overturn the trial court's judgment.   *State v. Dossett*, 2d Dist. Montgomery No. 20997, 2006-Ohio-3367, ¶ 32.

{¶ 31}   The credibility of the witnesses and the weight to be given to their testimony are matters for the trier of facts to resolve.   *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1997).

> Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility.   The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness. *State v. Lawson,* 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997).

This court will not substitute its judgment for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict. *State v. Bradley*, 2d Dist. Champaign No. 97-CA-03, 1997 WL 691510 (Oct. 24, 1997).

{¶ 32}   R.C. 2911.02 proscribes robbery and provides in relevant part: "(A)   No person, in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, shall do any of the following: * * * (2) Inflict, attempt to inflict, or

threaten to inflict physical harm on another."

{¶ 33} We initially note, while Piersoll implies that the familial and long-standing relationships between several of the State's witnesses somehow render their testimony suspect, he does not indicate how those relationships undermine the credibility of Fisher, Longberry, Rice and Mitchell, whose testimony the jury clearly credited. Further, Freeman, and especially Wilson, the mother of Piersoll's child, have an obvious interest in Piersoll's exoneration, and the jury clearly discredited their testimony. We defer to the factfinder's assessment of credibility.

{¶ 34} Regarding Mitchell's failure to identify Piersoll, while Mitchell did not see his face, Mitchell testified that when the police officers returned to the scene with Piersoll, he recognized Piersoll's clothing as that worn by his attacker. Mitchell described Piersoll's jacket in part as a "dark-colored coat," and in fact the coat is brown. Further, Longberry and Rice corroborated Mitchell's testimony regarding the robbery, namely that Freeman went through Mitchell's pockets, and Piersoll hit Mitchell in the head. It is irrelevant that Mitchell testified that he did not know which of the men took his money. "Ohio 'extend[s] criminal responsibility to an accomplice who harbored the mental state necessary for the commission of the crime,'" [1] and the jury was instructed on accomplice liability. Furthermore, Mitchell testified that he had taken his prescription medication on the day of the robbery.

{¶ 35} Regarding Piersoll's assertion that there was "a total lack of physical evidence" of a theft offense, since Mitchell was in possession of his phone when police

---

[1] *State v. Burrus*, 2d Dist. Montgomery No. 22960, 2009-Ohio-7037, ¶ 11.

arrived, and no money was recovered, Mitchell testified that his cell phone and money, namely $7.00 that his parents had given him, were stolen. Mitchell further testified that Fisher demanded his cell phone be returned but was unable to recover his money. While Fisher testified that he recovered the phone from Freeman, and Longberry testified that Fisher recovered the phone from Piersoll, Fisher's, Longberry's and Mitchell's testimony was consistent that Mitchell's phone was taken from him by his attackers. Rice also testified that Freeman took Mitchell's phone and money. In other words, we cannot conclude that the evidence presented at trial weighed heavily against the jury's finding that Piersoll committed a theft offense.

{¶ 36}  Regarding Piersoll's emphasis on the fact that Exhibit A does not contain an inside pocket in which to conceal a weapon, along with the fact that a weapon was never recovered, we initially note that there was substantial evidence from which the jury could conclude that Piersoll committed a robbery as charged in the indictment: Mitchell testified that Piersoll told him that he had a weapon and showed him a gun; Longberry stated that she observed Piersoll hand Freeman a gun; and Rice stated that she observed Piersoll with a weapon, and that he "threw it to [Freeman.]"

{¶ 37}  Significantly, R.C. 2911.02 prohibits the infliction of physical harm or the threat thereof in the commission of a theft offense. Mitchell testified that Piersoll not only threatened him with a gun while committing the theft but also hit him on the side of the head as he turned in the direction of James Fisher. Longberry testified that Piersoll "punched [Mitchell] in the side of his face," and Melissa Rice testified that Piersoll "hit [Mitchell] in the side of his head." Lewis stated that he offered Mitchell medical treatment because he

said he had been assaulted, and because there was a visible red mark on the side of his head. In other words, the testimony of Mitchell, Longberry, Rice and Lewis, if believed, establish that Piersoll inflicted physical harm on Mitchell while committing the theft offense, and the evidence accordingly does not weigh heavily against Piersoll's conviction for robbery.

{¶ 38} Having thoroughly reviewed the entire record, weighed all of the evidence and the reasonable inferences, we cannot conclude that the jury lost its way and created a manifest miscarriage of justice such that Piersoll is entitled to a new trial. Since Piersoll's conviction is not against the manifest weight of the evidence, his sole assigned error is overruled, and the judgment of the trial court is affirmed.

. . . . . . . . . .

GRADY, P.J. and FAIN, J., concur.

Copies mailed to:

Lisa M. Fannin
Monte K. Snyder
Hon. Richard J. O'Neill